FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 APR 28 PM 3 43

STEPHAN HARRIS, CLERK
CASPER

Darold W. Killmer
Danielle C. Jefferis
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
PHONE (303) 571-1000; FAX (303) 571-1001
Email: dkillmer@kln-law.com; djefferis@kln-law.com

Donald L. Fuller
Ian K. Sandefer
FULLER, SANDEFER & ASSOCIATES
Attorneys at Law, LLC
242 South Grant Street
Casper, WY 82601
PHONE (307) 265-3455; FAX (307) 265-2859
Email: fuller@fullersandeferlaw.com; sandefer@fullersandeferlaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

THOMAS ASPREY;                              )
LESLIE GLUSTROM,                            )
                                            )
        Plaintiffs,                         )
                                            )
v.                                          )        Civil Action No. **15 CV   63**
                                            )
PEABODY ENERGY CORPORATION;                 )
NORTHERN WYOMING COMMUNITY                  )
COLLEGE DISTRICT; and                       )
LIEUTENANT CHAD TREBBY,                     )
in his official and individual capacities,  )
                                            )
        Defendants.                         )

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Thomas Asprey and Leslie Glustrom, by and through their counsel, Darold W.

Killmer and Danielle C. Jefferis of KILLMER, LANE & NEWMAN, LLP, and Donald L. Fuller and

1

Ian K. Sandefer of FULLER, SANDEFER & ASSOCIATEs, LLC respectfully allege for their

Complaint and Jury Demand as follows:

## I.     INTRODUCTION

> Then the coal company came with the world's largest shovel
> And they tortured the timber and stripped all the land
> Well, they dug for their coal till the land was forsaken
> Then they wrote it all down as the progress of man.
>
> "And daddy won't you take me back to Muhlenberg County
> Down by the green river where paradise lay?"
> "Well, I'm sorry my son, but you're too late in asking
> Mister Peabody's coal train has hauled it away"

- John Prine, "Paradise"[1]

1.     Peabody Energy Corporation ("Peabody") boasts that it is the world's largest

private-sector coal company, and its mining operations in the Powder River Basin in Wyoming

are substantial and growing. Peabody's business practices and the effect of its mining operations

on the environment have earned the company significant disapprobation among activists and

protesters, many of whom engage in constitutionally protected free speech and protest of the

company at the annual corporate shareholders meetings.

2.     In 2013, Peabody arranged to hold its annual shareholders meeting in Gillette,

Wyoming rather than at its corporate headquarters in St. Louis, Missouri, in part because such a

location would attract fewer visible protest activities. Some protesters, including plaintiffs in this

---

[1] "Paradise" and its direct protest against the environmental impacts wrought by unmitigated strip mining has struck a resonant chord in American culture. Musical and cultural icons including Johnny Cash, John Denver, The Everly Brothers, Roy Acuff, Tom T. Hall, Jimmy Buffett, Dwight Yoakam and John Fogerty, among many others, have recorded versions of the protest song. *See* http://en.wikipedia.org/wiki/Paradise_%28John_Prine_song%29.

action, did attend, however. Defendants Peabody and the Northern Wyoming Community

College District ("NWCCD"), acting jointly and cooperatively with each other, attempted

illegally to limit the constitutionally protected free speech activities of those who wished to

protest, and when plaintiffs peacefully displayed a banner which read, simply "Peabody

Abandons Miners," caused the unconstitutional arrest and jailing of plaintiffs.

## II.     JURISDICTION AND VENUE

3.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1367.

This action is authorized and instituted pursuant to 42 U.S.C. §§ 1983 and 1985. This Court has

supplemental jurisdiction over any and all state law claims pursuant to 28 U.S.C. § 1367.

Jurisdiction supporting Plaintiffs' claims for attorney's fees and costs is conveyed by 42 U.S.C.

§ 1988.

4.     The acts described herein were committed within the jurisdiction of the United

States District Court for the District of Wyoming. Venue is proper pursuant to 28 U.S.C.

§ 1391(b)(2).

## III.     PARTIES

5.     Mr. Asprey and Ms. Glustrom are highly educated professionals committed to

raising awareness of environmental and social justice issues, including labor rights and issues

pertaining to environmental protection. At all times relevant to this Complaint, Plaintiffs were

citizens of the United States and domiciled in the State of Colorado.

6.     Mr. Asprey, retired, was an electrical engineer at Hewlett Packard/Intel for

twenty-seven years. He is now a member of Citizens for Boulder's Clean Energy Future and

other local political groups. He actively pursues initiatives and programs involving affordable and renewable energy sources and defending the rights of workers. In additional to scholarly publications, Mr. Asprey has written op-eds discussing energy planning and his hopes for Boulder's clean energy future. Mr. Asprey is a law-abiding citizen.

7.      Ms. Glustrom has worked on environmental issues since 1977. After earning her bachelor's and master's degrees in biochemistry from the University of Wisconsin-Madison, she turned down a full-ride graduate fellowship from the National Science Foundation to devote herself to researching and working on issues at the intersection of science and society. Ms. Glustrom has won numerous awards for her work. She has intervened at the Colorado Public Utilities Commission, and she has twice testified before congressional committees on ecological impacts of livestock grazing. She follows the coal industry carefully, both for its environmental impacts and its treatment of its miners. Ms. Glustrom is a law-abiding citizen.

8.      Defendant Peabody Energy Corporation describes itself as the world's largest private-sector coal company. Peabody is a Delaware public corporation. Its corporate headquarters are located at 701 Market Street, St. Louis, Missouri, 63101. Peabody operates offices across several continents and owns majority interests in at least twenty-seven mining operations in the United States and Australia. According to the United States Department of Labor, Peabody's largest mining operation is the North Antelope Rochelle Mine in Campbell County, Wyoming. Although it is a private corporation, at all times relevant to this Complaint and under the circumstances described herein, Peabody was acting under color of state law.

9. Defendant Northern Wyoming Community College District is a public educational entity in the State of Wyoming and consists of Sheridan College, Gillette College, and various satellite sites. NWCCD has its own Police Department. NWCCD police officers are Certified Wyoming Peace Officers and hold the same authorities, powers, and responsibilities granted under Wyoming law as Wyoming municipal and county police officers. At all times relevant to this Complaint, NWCCD was acting under color of state law.

10. At all times relevant to this Complaint, Defendant Lieutenant Chad Trebby was employed as a law enforcement officer by the Northern Wyoming Community College District Police Department and acting under the color of state law.

## IV. FACTUAL ALLEGATIONS

11. Peabody's corporate headquarters are in St. Louis, Missouri. For every year (until 2013) since it became a publicly traded company in 2001, Peabody held its annual shareholders meeting at its St. Louis headquarters.

12. As one of the largest coal companies in the world, Peabody is often the target of protest and dissent. The company is frequently criticized for its destructive environmental policies across the world, as well as its mistreatment and abuse of its current and former labor force, consisting largely of coal miners. Public dissent and protest on these topics raise significant issues of public concern.

13. For example, in 2013 the United Mine Workers of America led rallies against Peabody for orchestrating a scheme by which the company caused the loss of healthcare and pension benefits to its unionized retirees who had devoted their lives to Peabody's Appalachian

5

mining operations. As part of this exploitative and unfair scheme, Peabody created a spin-off

corporation for its Appalachian mining operations, Patriot Coal, and saddled it with far more

liabilities than assets, thus ensuring the spin-off's inevitable failure and bankruptcy. This

deliberate plan to evade the financial responsibilities Peabody owed (and previously guaranteed)

to its workers inspired many to conclude that Peabody abandons its miners.[2]

14.     Because of this widely publicized conduct – and many other corporate activities

seen by many as detrimental to the environment, the communities in which it operates, and the

labor force it exploits –Peabody's meetings in St. Louis have in recent years attracted increasing

numbers of critics of the company's labor, environmental, and corporate governance policies. In

2012, for example, nearly 100 people reportedly protested outside the company's headquarters

during its annual meeting, expressing views critical of its policies and practices.

15.     In 2013, Peabody sought a location for its shareholders meeting far removed from

St. Louis, at least in part to reduce the ability or likelihood that such individuals and groups

would attend the meetings to voice and publicize their opposition, and to escape the large

protests of which the company had been (and still is) a target in St. Louis.[3]

---

[2]*See, e.g.*, Tiffany Kary, *Patriot Coal Wins Leave to Cut Retiree Pensions, Benefits*, BLOOMBERG
BUSINESS (May 29, 2013, 3:57 MDT), http://www.bloomberg.com/news/articles/2013-05-29/patriot-coal-
wins-approval-to-cut-retiree-pensions-benefits-1-).

[3] According to New York University professor of finance David Yermack (and co-author of a study titled
"Evasive Shareholder Meetings"), this practice is common: "Managers [of companies] may want to avoid
the theatrical protests and other campaigns that can generate unfavorable news coverage, so they hold the
meetings in faraway places to make it harder to get there." *See* Elizabeth Olson, *Beward When the Annual
Meeting Is in Moosejaw*, N.Y. TIMES, May 8, 2014, at F2.

16. For its 2013 annual shareholder meeting, Peabody chose Gillette, Wyoming – a remote spot about 1,000 miles away from its St. Louis headquarters, in a town of less than 32,000 people, in a county of less than 50,000 people, and in a state of less than half a million people.

17. Campbell County, of which Gillette is the county seat, also happens to be in the heart of the Powder River Basin and the home of Peabody's largest coal mine. Coal is one of the largest sources of tax revenue for Wyoming's state and local governments and, unlike Appalachian coal, is significantly subsidized by United States taxpayers.[4]

18. For months leading up to the meeting in Gillette, the Peabody executive security team worked closely and jointly with NWCCD to coordinate the logistics and security issues related to the upcoming shareholders meeting. These joint and coordinated preparations included planned regulation and, if necessary, the response to any First Amendment-protected activity that might occur at the shareholders meeting. Although Peabody had moved the meeting to a faraway, remote (from its St. Louis headquarters) location, the company still anticipated at least some protesters would attend the meeting.

19. In fact, Peabody's executive security team had obtained "intelligence" prior to the meeting regarding certain individuals who planned to be at the meeting in Gillette and whom

---

[4] The Bureau of Land Management manages the publicly-owned Powder River Basin, and holds auctions to lease the land containing large tracts of coal. These auctions, however, often consist of just one bid from one bidder – Peabody – at extraordinarily low prices. Many believe that taxpayers lose billions of dollars through this process, with the only party to benefit being Peabody. *See, e.g.*, *U.S. taxpayers lose more than $1 billion with BLM OK of Peabody's low-ball bid for Powder River Basin Coal*, IEEFA, June 29, 2012, http://ieefa.org/u-s-taxpayers-lose-more-than-1-billion-with-blm-ok-of-peabodys-low-ball-bid-for-powder-river-basin-coalbasin-coal/.

Peabody expected to express views critical of and in opposition to the company. The executive security team's efforts in instructing, directing, and conspiring with NWCCD were focused on controlling or suppressing the speech and activities of these previously identified individuals (and others with similar views critical of Peabody).

20.     This willful joint activity and coordination between Peabody and NWCCD included the exchange of multiple emails and phone conversations with the NWCCD PD, and numerous on-site visits at Gillette College prior to the shareholder meeting.

21.     NWCCD willingly abdicated a significant amount of authority and influence to Peabody in the planning and organization of law enforcement security measures that would govern citizen attendance and participation at the upcoming corporate shareholders meeting.

22.     Specifically, as soon as the meeting location was announced, the Peabody executive security team contacted the NWCCD PD via email to discuss its concerns regarding anticipated First-Amendment activity and to instruct the NWCCD PD as to how law enforcement should and would handle any "incidents" that may occur. Such communications between Peabody and NWCCD, coordinating joint law enforcement and security activities, were frequent in the planning stages leading up to the April 29, 2013 shareholders meeting.

23.     NWCCD and Peabody reached agreements on the coordination and joint participation of each of them in law enforcement activities which would govern the meeting. Peabody, at NWCCD's consent and acquiescence, exercised material and considerable influence on such law enforcement coordination and policy applicable to security at the meeting.

24.    Defendant NWCCD delegated significant amounts of its state authority to Defendant Peabody to regulate and control expressive activity on the NWCCD campus inside and outside and before and after the shareholders meeting. Peabody willfully accepted this delegation of authority.

25.    For example, Peabody instructed and directed the NWCCD PD on how to carry out Peabody's plan to create so-called "free speech zones" that would regulate expressive activities at the meeting. Peabody and NWCCD reached an agreement that these so-called "free speech zones" would carry with them the force of law, and would be enforced under color of state law.

26.    No pre-existing, standing "free speech zones" existed on the NWCCD campus, and the creation of such regulations on protest and other free speech activities, which by agreement between these defendants would be enforced under color of state law, was entirely a creation of the agreement between Peabody and NWCCD.

27.    NWCCD is a public educational institution, where open debate, dialogue, and inquiry should occur without restriction.

28.    Both NWCCD and Peabody acted intentionally and jointly in furtherance of Peabody's plan to regulate and control expressive activity and pursuant to a common understanding that the coercive elements of the plan would be enforced by NWCCD law enforcement officers – the only parties with the express power to arrest citizens for violation of the law.

29.     Given their careers and the issues on which they work and for which they are
passionate, Mr. Asprey and Ms. Glustrom wished to attend Peabody's annual shareholder
meeting at the NWCCD Gillette Campus.

30.     So that they would be allowed to attend the meetings associated with the
shareholders meeting, Mr. Asprey and Ms. Glustrom obtained shareholder proxies from those
shareholders who could not attend. They traveled from Colorado to Gillette with the intention of
legally attending the shareholder meeting and abiding by all legitimate rules, regulations and
laws, and to express disagreement with certain company policies and practices in a peaceful and
law-abiding way, as is protected and permitted by the United States and Wyoming Constitutions.

31.     Peabody's executive security team, in coordination and cooperation with
NWCCD law enforcement, designated two locations on the Gillette Campus as so-called "free
speech zones" for "activism" – one zone for so-called "pro"-Peabody activities and one zone for
so-called "anti"-Peabody activities.

32.     As described by Defendant Officer Trebby in his official report, the joint
Peabody-NWCCD law enforcement initiatives were well-planned and coordinated:

**INITIAL RESPONSE:**

On 04/29/2013 the Peabody Energy Corporation was hosting its annual shareholders meeting on the Gillette campus of the Northern Wyoming Community College District (NWCCD). As a law enforcement officer for the NWCCD, I had been working with the executive security team from Peabody Energy for a few months leading up to this event. Approximately a week prior to the event I received information from their security team that they were anticipating protest activity from activists whom they have had previous contact with at their home office in St. Louis Missouri. It was also brought to our attention that many of the identified activists had been arrested for civil disobedience related offenses in previous protests. On the morning of 04/29/2013 prior to the event several individuals identified from our prior intelligence had been observed in Gillette.

In preparation for protest activity on campus as a result of the shareholders meeting and in accordance with our organizational policies, there were two established protest areas on campus. The protest areas were identified by orange fencing and were each approximately 2500 ft.$^2$ in size. We had identified one area for anyone choosing to voice their concerns in opposition of coal, and the second for persons in support of coal or in opposition of those opposing coal.

33.     The "free speech zone" for pro-Peabody activities (Area B in the below diagram) was next to the Presentation Hall where the meeting was held. The "free speech zone" for anti-Peabody activities (Area C in the below diagram) was on an undeveloped dirt area removed from the Presentation Hall and other campus buildings.



First told to go to protest area here

Free Speech Area

Arrested here

Met Miners here and let them take a picture

Car Parked Here

Sinclair

34. In addition to their extensive joint preparations with and instructions of the NWCCD PD in the months leading up to the meeting, Peabody's senior leadership and executive security team was conspicuously and visibly present on the day of the meeting, and working closely with and directing the NWCCD law enforcement officers on issues of security. Peabody and NWCCD had an agreement that violations of the security measures set up for the meeting (such as the limitation of free speech activities to the so-called "free speech zones") would be enforced under color of state law.

35. For example, Vic Svec, Peabody's Senior Vice President of Global Investor and Corporate Relations, is seen in the photograph below in close proximity to and working

shoulder-to-shoulder, jointly and in cooperation with, an NWCCD law enforcement officer on the day of the meeting.



36.     Mr. Asprey and Ms. Glustrom quietly attended the shareholders meeting inside the Presentation Hall. They abided by all rules and did not disrupt the proceedings in any way.

37.     After the meeting, Defendant Officer Trebby, acting jointly with Peabody security officials, saw Mr. Asprey and Ms. Glustrom near the exit of the Presentation Hall where the meeting had been held. Mr. Asprey and Ms. Glustrom were calmly and peacefully carrying a rolled-up banner that, when unfurled, read "Peabody Abandons Miners."

38.     Pursuant to the instructions and orders of the Peabody security team, Defendant Trebby demanded that Mr. Asprey and Ms. Glustrom move to the designated "free speech zone" to express any anti-Peabody activities.

39.     According to Defendants, Mr. Asprey's and Ms. Glustrom's "Peabody Abandons Miners" banner constituted anti-Peabody activity, and such anti-Peabody expressive activities was limited to the designated far-removed "free-speech zone".

40.     Mr. Asprey and Ms. Glustrom complied immediately with Defendant Trebby's request. They walked over to the designated zone and posed for the below photograph with their banner.  As depicted in that photograph, the free speech zone is in an area with virtually no human activity or presence.



41.     After having their photograph taken, Mr. Asprey and Ms. Glustrom started to walk toward the parking lot to their car. They intended to get into their car and return to their homes in Colorado.

42.     Prior to reaching their car, they saw three miners wearing t-shirts stating "Peabody promised." Mr. Asprey and Ms. Glustrom asked the miners if they would like to have their photograph taken with the "Peabody Abandons Miners" banner. The miners said yes, so Mr. Asprey and Ms. Glustrom paused for just a moment to unfurl the banner and stand with the miners while the photograph below was taken.



43.    Almost immediately after the photograph was taken, Officer Trebby determined that Mr. Asprey and Ms. Glustrom would be arrested pursuant to the security and law enforcement plan and policy previously designed to regulate "activist" activities attendant with the shareholders meeting.  Defendant Officer Trebby started to arrest Mr. Asprey and Ms. Glustrom.

44.    Mr. Asprey and Ms. Glustrom politely told Defendant Trebby that he was infringing on their First Amendment rights. Defendant Trebby ignored their objections and, still pursuant to and in agreement with the previous jointly-developed (with Peabody) law

16

enforcement plan for protest activities associated with the shareholders meeting, proceeded with arresting Mr. Asprey and Ms. Glustrom, allegedly for trespassing. He claimed that Mr. Asprey and Ms. Glustrom were blocking traffic.

45.     Mr. Asprey and Ms. Glustrom were not trespassing.  They were entitled to be at the shareholders meeting, and were entitled to be present on the college campus, which is on public property.

46.     Mr. Asprey and Ms. Glustrom were not blocking traffic, nor were they violating any legitimate law or regulation.  They were arrested because of their expressive activities on issues of public concern; namely for their displaying of the banner which read "Peabody Abandons Miners."

47.     At no point did Mr. Asprey or Ms. Glustrom raise his or her voice or refuse to comply with Defendant Trebby's commands.

48.     Further, at no point did Mr. Asprey or Ms. Glustrom disturb any peace or impede any traffic. As shown in the above photograph with the miners – taken just moments before Mr. Asprey and Ms. Glustrom were arrested – there was, at most, only insignificant, stationary traffic in the parking lot, and not any traffic Mr. Asprey and Ms. Glustrom were or even could have been blocking in any material way while briefly having their photograph taken there.

49.     Mr. Asprey and Ms. Glustrom had expressed ideas and words critical of Peabody – ideas and words Peabody had taken every effort in conjunction with NWCCD law enforcement to regulate, restrain and silence from the day that the company decided to hold its meeting in Gillette.

50.     Peabody was a willful, active participant in and cause of NWCCD's arrest of Mr. Asprey and Ms. Glustrom.

51.     The only authority that Peabody could not exercise on its own was the independent authority to arrest those expressing such dissenting ideas and words – that is, those exercising their First Amendment-protected activities. Thus, the company used the NWCCD Police Department as an extension of its own executive security team to arrest and detain Mr. Asprey and Ms. Glustrom.

52.     The nexus between Peabody and the governmental authority exercised in arresting Mr. Asprey and Ms. Glustrom is so close that Peabody's conduct may be fairly treated as that of the State itself.

53.     Further, Peabody so far insinuated itself into a position of interdependence with NWCCD that it must be recognized as a joint participant in the arrest of Mr. Asprey and Ms. Glustrom.

54.     NWCCD delegated to Peabody a function traditionally exclusively reserved to the State – that is, the power to impose time, place, and manner restrictions on speech and expressive activity at a public educational institution on public property.

55.     Peabody jointly participated in the law-enforcement activities related to protest and expressive activity on the college campus on that day. A member of Peabody's executive security team (right) is depicted in the photograph below in close proximity to, and overseeing, the NWCCD law enforcement officers arresting Ms. Glustrom.



56.    Mr. Asprey and Ms. Glustrom were arrested in public, handcuffed, and escorted to the Campbell County jail.  Even though they were arrested on only a minor offense, and even though they cooperated with law enforcement while being arrested and did not otherwise present any security or legal risk, Mr. Asprey and Ms. Glustrom were required to spend the night in jail.

This deprivation of their freedom was disproportionate to any offense they had even allegedly committed, and deviated from the procedure typically followed by law enforcement under similar circumstances. They had difficulties communicating with their loved ones who were expecting them back in Boulder that night.

57.    Mr. Asprey and Ms. Glustrom were deprived of significant liberty interests without due process of law.

58.    Rather than drop the frivolous charges, the Campbell County District Attorney proceeded full-force in prosecuting Mr. Asprey and Ms. Glustrom. As a result, they had no choice but to retain criminal defense counsel to defend them against the baseless charges, and they were required to travel from Boulder to Gillette for two additional hearings in the subsequent months. Due to the long drive, this required Mr. Asprey and Ms. Glustrom to stay overnight in a hotel each time.

59.    Ultimately, Mr. Asprey's and Ms. Glustrom's defense team filed a motion to dismiss the criminal charges against them based on the contention that the charges and prosecution violated their First Amendment rights.

60.    Fortunately, Judge Wendy M. Bartlett of the Circuit Court of the Sixth Judicial District recognized the frivolousness and lack of legal justification for the charges. After an evidentiary hearing on the matter, the court issued an order dismissing the charges on the ground that their prosecution would have violated the Fourth Amendment because Defendant Trebby had no probable cause to arrest Mr. Asprey and Ms. Glustrom. In a written order, the court recognized the serious implications of the First Amendment as well, writing, "Free speech is one

of the most valued rights in the United States." *See* Attachment 1 (Order Dismissing Charges),

the contents of which are incorporated herein as if fully set forth.

     61.    Judge Bartlett continued:

> The protest group including the Defendants [Mr. Asprey and Ms.
> Glustrom] was told they must restrain activism to the designated
> areas on the campus. There is no evidence the Defendants were
> engaged in "activism" (as defined by Lt. Trebby) when they were
> arrested. The record indicates that the meeting had adjourned and
> the Defendants were in the parking lot with three other individuals
> (wearing anti Peabody t-shirts and posing, one with clenched fists
> and upraised arms) taking a photograph with the banner. *It is
> simply that, a photo opportunity.*

*Id*. (emphasis added).

     62.    With regard to the remedy for Mr. Asprey's and Ms. Glustrom's unlawful arrest,

the court concluded, "Because the Court finds the arrests in the present case violated the

Defendants' Fourth Amendment rights an[d] there is no evidence that can be suppressed[, t]he

only effective remedy is dismissal of the charges." *Id*.

     63.    Defendants' unlawful conduct has caused Mr. Asprey and Ms. Glustrom

significant injuries, damages, and losses.

     64.    To make matters worse, in the months leading up to the filing of this lawsuit,

Peabody has threatened Mr. Asprey and Ms. Glustrom (and their undersigned counsel) with legal

sanctions as further retaliation should they proceed with enforcing their constitutionally

protected rights in court. These retaliatory threats are only a continuation of Peabody's constant

and longstanding efforts to silence those critical of its policies and practices.

## V.     STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment — Retaliation for Exercise Free Speech/Expression
### (Against All Defendants)

65.     Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set

forth herein.

66.     Plaintiffs engaged in protected activity under the First Amendment's rights to free

speech and expression by carrying, unfurling, and displaying their banner reading "Peabody

Abandons Miners."

67.     Plaintiffs' speech and expression were related to matters of public concern.

68.     Defendants jointly and on their own accord responded to Plaintiffs' First

Amendment-protected activity with retaliation, including but not limited to causing the unlawful

arrest of them with no probable cause for such arrest.

69.     Defendants' retaliatory actions were substantially motivated by Plaintiffs'

exercise of their First Amendment rights.

70.     By unlawfully arresting and causing the continued prosecution of Plaintiffs,

Defendants sought to punish Plaintiffs for exercising their First Amendment rights and to silence

their future speech and restrict their freedom of expression, and the future speech and expression

of others. Defendants' retaliatory actions would chill a person of ordinary firmness from

engaging in such First Amendment-protected activity.

22

71.    Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

72.    The acts and omissions of Defendant Trebby were engaged in pursuant to the customs, policies, and practices of Defendants Peabody and/or NWCCD, which encourage, condone, tolerate, and ratify the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant Peabody and/or exercising their rights of free speech and dissent.

73.    Defendant Peabody is liable for the acts and omissions of its agents.[5]

74.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

75.    At all times relevant to this Complaint, Defendants were acting under the color of law.

76.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth and Fourteenth Amendment — False Arrest / Unlawful Seizure
### (Against All Defendants)

77.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

---

[5] Plaintiffs recognize that under typical circumstances in the context of an indisputably public actor the law does not recognize *respondeat superior* liability for constitutional violations of supervisory actors. In the context of a private corporation that is acting under color of state law, however, respondeat superior liability is available and appropriate. *See generally Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014) *cert. denied* 2015 U.S. LEXIS 442 (U.S. Jan. 12, 2015).

78.     The actions of Defendants as described herein, while acting under color of law, intentionally deprived Plaintiffs of the securities, rights, privileges, liberties, and immunities secured by the United States Constitution, including their right to freedom from unlawful seizure as guaranteed by the Fourteenth Amendment, in that Plaintiffs were arrested without any reasonable justification or probable cause.

79.     Defendants intentionally, knowingly, recklessly, and excessively restrained and detained Plaintiffs without any reasonable justification or probable cause.

80.     Defendant Trebby had no facts or circumstances within his knowledge to warrant him to believe that Plaintiffs had committed any offense.

81.     Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

82.     Defendants' conduct in causing the unlawful arrest and seizure of plaintiffs were in accordance with the organizational policies developed, implemented and enforced jointly by defendants to unlawfully restrict, prohibit and/or punish constitutionally-protected expressive activity on public property regarding issues of significant public concern.

83.     The acts and omissions of Defendant Trebby were engaged in pursuant to the customs, policies, and practices of Defendants Peabody and NWCCD, which encourage, condone, tolerate, and ratify the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant Peabody and/or exercising their rights of free speech and dissent.

84.   Defendant Trebby's conduct violated the clearly established rights of Plaintiffs of which a reasonable officer in his position would have or should have known.

85.   Defendant Peabody is liable for the acts and omissions of its agents and of its joint-conspirators and participants in the unconstitutional conduct as described more fully herein.

86.   At all times relevant to this Complaint, Defendants were acting under the color of law.

87.   Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment — Deprivation of Liberty Without Due Process**
**(Against All Defendants)**

88.   Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

89.   Plaintiffs were deprived of their liberty without due process when they were unlawfully arrested, charged with baseless offenses, and thrown in jail overnight and by the continued prosecution of them caused by the unconstitutional conduct described herein.

90.   Defendants caused the deprivation of Plaintiffs' liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

91.   Defendants' unlawful arrest of Plaintiffs, which led to the deprivation of their liberty, was meritless and unsupported by probable cause or reasonable justification.

92.     Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

93.     The acts and omissions of Defendant Trebby was engaged in pursuant to the customs, policies, and practices of Defendants Peabody and NWCCD, which encourage, condone, tolerate, and ratify false arrests by law enforcement officers of individuals expressing viewpoints critical of Defendant Peabody  and/or exercising their rights of free speech and dissent.

94.     Defendant Trebby's conduct violated the clearly established rights of plaintiffs of which a reasonable officer in his position would have or should have known.

95.     Defendant Peabody is liable for the acts and omissions of its agents and of its joint-conspirators and participants in the unconstitutional conduct as described more fully herein.

96.     At all times relevant to this Complaint, Defendants were acting under the color of law.

97.     Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1985
### Conspiracy to Interfere with Civil Rights
### (Against All Defendants)

98.     Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

99. Defendants conspired for the purpose of depriving, either directly or indirectly, Plaintiffs the equal protection of the laws, or of equal privileges and immunities under the laws.

100. Defendants acted in furtherance of this conspiracy by classifying Plaintiffs according to the content of their speech and expressive activities and then arresting Plaintiffs without probable cause in violation of the constitutionally protected fundamental rights to free speech and expression.

101. Defendants deprived Plaintiffs of having and exercising the rights and privileges enjoyed by all citizens of the United States.

102. Defendants were motivated by invidious, discriminatory animus toward Plaintiffs based on the content of their speech and expressive activities.

103. Defendants NWCCD and Peabody are liable for the actions and omissions of their agents.

104. Defendants' actions and/or omissions, engaged in jointly and willfully, caused, directly and proximately, Plaintiffs to suffer significant injuries, damages and losses.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy
### (Against All Defendants)

105. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

106. Defendants acted in concert and pursuant to their common design to unlawfully restrain Plaintiffs' expressive activity, arrest them without probable cause and/or in retaliation

for their exercise of their fundamental constitutional rights, and deprive them of their liberty without due process.

107.    Defendants acted in concert and pursuant to their common design for the purpose of and intending to accomplish the above-described violations of and injuries to Plaintiffs' constitutional rights.

108.    Defendants' conduct was tortious in that it violated the fundamental constitutional rights of Plaintiffs.

109.    Defendants' concerted actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Pre-judgment and post-judgment interest at the highest lawful rate;

f.  Attorney's fees and costs; and

g.  Such further relief as justice requires.

Dated this 28th day of April, 2015.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____

Darold W. Killmer*
Danielle C. Jefferis*
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dkillmer@kln-law.com
djefferis@kln-law.com

\* To be admitted *Pro Hac Vice*

FULLER, SANDEFER & ASSOCIATES

_____

Ian K. Sandefer
242 South Grant
Casper, Wyoming 82601
(307) 265-3455
sandefer@fullersandeferlaw.com

*Attorneys for Plaintiffs*

**Demand for Jury Trial**

Plaintiffs hereby demand trial by a jury of six (6) persons of all issues so triable.

DATED and SIGNED this 28th day of April, 2015.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____

Darold W. Killmer*
Danielle C. Jefferis*
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dkillmer@kln-law.com
djefferis@kln-law.com

* To be admitted *Pro Hac Vice*

FULLER, SANDEFER & ASSOCIATES

_____

Ian K. Sandefer
242 South Grant
Casper, Wyoming 82601
(307) 265-3455
sandefer@fullersandeferlaw.com

*Attorneys for Plaintiffs*

Attachment 1

Court

# Circuit Court of the Sixth Judicial District
## Campbell County, State of Wyoming



Wendy M. Bartlett
Circuit Court Judge

Terrill R. Tharp
Circuit Court Judge

Dena Holzer
Clerk of Court

500 South Gillette Ave
Suite 2200
Gillette, WY 82716

(307) 682-2190
(307) 687-6214 fax

March 3, 2014

Dan E. Reade
Campbell County Attorney's Office
500 S. Gillette Avenue, Suite B-200
Gillette, WY 82716

Don Fuller
Ian K. Sandefer
Fuller, Sandefer & Associates
242 South Grant Street
Casper, WY 82601

**Re: State of Wyoming v. Thomas Asprey, CR-2013-1023 & State of Wyoming v. Leslie Glustrom, CR-2013-1024**
**Ruling on Defendants' Combined Motion to Dismiss.**

Dear Counsel:

The above entitled matter comes before the Court on the Defendants' Combined Motion to Dismiss, filed October 21, 2013. Having considered the pleadings and argument by counsel on February 4, 2014, the Court finds and orders as follows:

On April 29, 2013, Peabody Coal Company held its annual share holders meeting at the Gillette Campus of the Northern Wyoming Community College District ("Gillette Campus"). The meeting was held at the presentation hall. College classes were in session on April 29, 2013. College police met with Peabody security in advance of the meeting and designated two locations ("free speech zones") near the college building for "activism." Lt. Trebby of the college police testified that the college allows "activism" in designated areas. According to Lt. Trebby "activism" is defined by the college policy as "anyone demonstrating or voicing their opinion for or against any topic that would disrupt day to day activities of the campus." The areas were located on the east and west ends of the building (Defendants Exhibit F). The area designated for "anti-Peabody" was located furthest from the presentation hall. Prior to the meeting college police met with the "protestors", including the defendants and advised they must contain their "activism" to the designated areas, the "protestors" begrudgingly agreed.

1

When the meeting was ended, Lt. Trebby saw the defendants (voting shareholders) near the exit of the presentation hall holding a banner stating "Peabody abandons miners." Lt. Trebby told the defendants to move to a designated "activism" area and directed them to the west "free speech zone". The defendants walked towards the zone with the banner unfurled. Officer Trebby told the defendants they could not have the banner unfurled until they were in the designated area, purportedly because they were blocking the way of travel in the parking lot. After arriving at the designated area, the banner was unfurled, a photo taken (Defendants Exhibit B) and then they left the area and joined others in the east side of the parking lot. At no time were the defendants warned that the display of the banner other than in the designated areas would result in arrest. On the east side of the parking lot the defendants unfurled the banner and three other participants had their photo taken in front of the banner (Defendants Exhibit A). There is no evidence of any disruption by the Defendants either in the college, at the shareholders meeting or in the parking lot. Shortly after the photo, Officer Trebby arrested the defendants without a warrant for violating W.S. §6-3-303, trespass.

The Defendants ask the Court to dismiss their charges "because a conviction would contravene the strictures of the First Amendment of the United States Constitution." *Defendant's Combined Motion to Dismiss*, page 1. The Defendants *are not* challenging the constitutionality of W.S. §6-3-303.

Free speech is one of the most valued rights in the United States. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Operation Save America v. City of Jackson*, 275 P.3d 438, 456 (Wyo. 2012) (internal citations omitted). Free speech however, is not without limitation. The government may impose restrictions on specific types of speech. "The degree of protection differs depending on whether the speech is political interest/public issue speech, commercial speech or government speech. Additionally, certain categories of speech are afforded limited or no protection, such as obscenity, fighting words, defamation, and fraud." *Id.* at 456-457. The Wyoming Supreme Court in *Operation Save America* provides an instructive analysis under the strict scrutiny standards of governmental restrictions. The Defendants here have also provided an accurate summary of the well settled law regarding governmental regulation of free speech. Several issues are presented by this case: whether the Gillette Campus imposed reasonable time, place and manner restrictions upon the Defendants; whether the arrest of the Defendants was unconstitutional (i.e. illegal); and whether the Court has the authority to dismiss the criminal charges under these circumstances.

The Defendants argue they were exercising their First Amendment rights and were illegally arrested. The First Amendment does not act as a shield to protect from prosecution. *Stahl v. State*, 665 P.2d 839 (Okla.1983) (finding journalists are not shielded from liability for torts or crimes by the First Amendment regardless of the fact they are engaged in newsgathering). However, the Defendants have a right under the Fourth Amendment to the United States Constitution:

> The right of the people to be secure in their persons, houses papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants

2

shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

and Article I, Section 4 of the Wyoming Constitution:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

to be free of unlawful seizures.

Probable cause for a warrantless arrest exists when under the totality of circumstances, a prudent, reasonable and cautious peace officer would be led to believe that a crime has been or is being committed. *Keehn v. Town of Torrington*, 834 P.2d 112 (1992). Arrest requires justification by probable cause to believe that a person has committed or is committing a crime. *Rodarte v. City of Riverton*, 552 P.2d 1245 (1976). Lt. Trebby in the present case arrested the Defendants for violating, W.S. §6-3-303 that reads in part:

(a) A person is guilty of trespass if he enters or remains on or in the land or premises of another person, knowing he is not authorized to do so, or after being notified to depart or to not trespass. For purposes of this section, notice is given by:

(i) Personal communication to the person by the owner or occupant, or his agent, or by a peace officer; or

(ii) Posting of signs reasonably likely to come to the attention of intruders.

Taking all of the evidence in the light most favorable to the State, the elements can be analyzed as follows:

Enter or remain in land or premises of another

The Defendants were on the Gillette Campus, a public facility prior to and at the time of their arrest. The Defendants were voting shareholders of Peabody Coal Company and invited to attend the shareholder meeting.

After being notified to depart or to not trespass

The Gillette Campus established "free speech" zones in accordance with policy. The protest group, including the Defendants, was informed they were to restrict "activism" to the designated areas. There is no evidence in the record that the Defendants were ever notified to leave or that they were trespassing. On two occasions they were told by Lt. Trebby that they could not display their banner anywhere but the designated areas. On both occasions the Defendants

3

complied with Lt. Trebby's requests. There is no evidence in the record that the Defendants were ever told that if they engaged in "activism" anywhere outside the designated areas they would be arrested for trespass. There is no evidence there were any trespass notices posted on the campus.

<u>Knowing he is not authorized to do so</u>

The protest group including the Defendants was told they must restrain activism to the designated areas on the campus. There is no evidence the Defendants were engaged in "activism" (as defined by Lt. Trebby) when they were arrested. The record indicates that the meeting had adjourned and the Defendants were in the parking lot with three other individuals (wearing anti Peabody t-shirts and posing, one with clenched fists and upraised arms) taking a photograph with the banner. It is simply that, a photo opportunity. If the Lieutenant interprets the banner holding as "activism" outside the designated areas then it must follow that the other three individuals in the photo were engaged in "activism" as well, yet they were not arrested. There is no evidence on the record that the Defendants had been advised by anyone that the display of the banner anywhere outside the designated areas would be deemed trespassing. Nor is there any evidence that would give such an inference.

Taking all the evidence as true, the court simply cannot find that there was probable cause to arrest the Defendants for violating W.S. §6-3-303. What remedy then applies? Typically the remedy for illegal searches and seizures is the suppression of evidence obtained after the illegal arrest. In the present case there is no such evidence to suppress. The Defendants ask the charges to be dismissed.

Dismissal of criminal charges for a violation of Constitutional rights is rare, but not unheard of. The courts have authority to dismiss cases for violation of speedy trial or double jeopardy. *State v. Naple*, 143 P.3d 358, 364 (Wyo.2006). The rule of law is less clear in the criminal context for violations of defendants First Amendment rights. The Defendants are asking the Court to enter an area reserved for the executive branch. Without any statutory authority, the Defendants must rely on the court's "inherent authority." As stated in the *Naple* case:

> [i]nherent" or "supervisory" powers include those powers, although not explicitly granted to the court by law, are necessary to the exercise of the courts other powers. In *Hasting*, the United States Supreme Court recognized three purposes for supervisory powers: "to implement a remedy for violation of recognized rights, to preserve judicial integrity . . . [and] as a remedy designed to deter illegal conduct." (internal citations omitted)(citing *United States v. Hasting* 461 U.S. 499, 505 (1983))

*Naple* at 363. Courts in Wyoming do not have authority to dismiss criminal charges in the interest of justice. *Id.* The United States Supreme Court in *Ex Parte United States* held that the judicial department has no inherent authority to refuse to try a criminal charge upon considerations extraneous to the legality of the charge. *Ex Parte United States*, 242 U.S. 27 (1916). The *Naple* case provides authority that courts may dismiss

4

criminal charges under the supervisory power doctrine.  The supervisory power doctrine "is interstitial in the sense that it applies only when there is no effective alternative provided by rule, statute, or constitutional clause." *Naple* at 364 (quoting *United States v. Horn*, 29 F.3d 754 (1ˢᵗ Cir.1994)).

Because the Court finds the arrests in the present case violated the Defendants' Fourth Amendment rights an there is no evidence that can be suppressed.  The only effective remedy is dismissal of the charges.  Therefore, Defendants' motion is granted.

Very Truly Yours,

Wendy M. Bartlett
Circuit Court Judge

**Circuit Court of the Sixth Judicial District, County of Campbell, State of Wyoming**

500 S. Gillette Avenue, Suite 2200, Gillette, WY 82716
307-682-2190

STATE OF WYOMING,

      *Plaintiff,*

vs.

LESLIE GLUSTROM,

      *Defendant.*

STATE OF WYOMING,

      *Plaintiff,*

vs.

THOMAS ASPREY,

      *Defendant.*

CR-2013-1025

CR-2013-1023

FILED FOR RECORD

MAR - 8 2014

CLERK OF CIRCUIT COURT
OF THE SIXTH JUDICIAL DISTRICT
CAMPBELL COUNTY

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

THIS MATTER came before the court upon the Defendants' Combined Motion to Dismiss. The court having considered the same, and in accordance with that certain DECISION LETTER-COMBINED MOTION DISMISS, dated March 3, 2014, which is incorporated herein by reference, finds that the Defendants' motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT Defendants' Combined Motion to Dismiss, filed October 21, 2013, is *granted* and the above captioned cases are *Dismissed.*

DATED March 3, 2014.

BY THE COURT:

Wendy M. Bartlett
Circuit Court Judge

Distribution:
Dam E. Reade, Prosecuting Attorney
Don Fuller, Defense Attorney
Ian Sandefer, Defense Attorney