Darold W. Killmer
Julian G.G. Wolfson
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
PHONE (303) 571-1000; FAX (303) 571-1001
Email: dkillmer@kln-law.com; jwolfson@kln-law.com

Donald L. Fuller
Ian K. Sandefer
FULLER, SANDEFER & ASSOCIATES
Attorneys at Law, LLC
242 South Grant Street
Casper, WY 82601
PHONE (307) 265-3455; FAX (307) 265-2859
Email: fuller@fullersandeferlaw.com; sandefer@fullersandeferlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| THOMAS ASPREY; | ) | |
| LESLIE GLUSTROM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-63-SWS |
| | ) | |
| PEABODY ENERGY CORPORATION; | ) | |
| NORTHERN WYOMING COMMUNITY | ) | |
| COLLEGE DISTRICT; and | ) | |
| LIEUTENANT CHAD TREBBY, | ) | |
| in his official and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT
## PEABODY ENERGY CORPORATION'S MOTION TO DISMISS

<u>**Introduction**</u>[1]

In 2013, Peabody Energy Company ("Defendant") arranged to hold its annual

shareholder meeting at the Northern Wyoming Community College District ("NWCCD") located

in Gillette, Wyoming.  The purpose of having the meeting in Wyoming, as opposed to

Defendant's headquarters in St. Louis, Missouri, was to reduce the likelihood that anti-Peabody

protesters would attend the meeting.  Complaint, ¶¶ 2, 14, 15, 16.

In order to minimize the opportunity and impact of those protesting against Peabody,

Defendant Peabody and NWCCD Police Department ("NWCCD PD") acted jointly and

cooperatively with each other to limit such protesters' ability to engage in constitutionally

protected free speech activities.  Specifically, Peabody devised, implemented, and supervised a

plan whereby NWCCD PD would arrest any protesters who expressed anti-Peabody sentiments

while not standing in the restricted areas designated by Defendants for such expressive activity

(hereafter sometimes referred to as the "Corporate Security Program").  This policy was very

intentionally devised by Peabody officials with authority to establish official corporate policy,

and by agreement among the Defendants, was enforced by NWCCD PD under color of state law.

Pursuant to the dictates of this policy and officially promulgated program, Plaintiffs were

arrested when they peacefully displayed a banner, which read "Peabody Abandons Miners,"

outside of the area designated for anti-Peabody protesters.  Although the NWCCD police officer,

Lt. Trebby, acting in concert with Peabody and pursuant to Peabody's official security policy,

arrested Plaintiffs for allegedly trespassing and blocking traffic, it is patently clear that Plaintiffs

were not violating any legitimate law or regulation.  Instead, Plaintiffs were arrested solely

because they were engaged in expressive conduct critical of Peabody in violation of their

---

[1] All facts detailed herein are taken from or fairly supported by the allegations in Plaintiffs' Complaint.

constitutional rights.  Indeed, Wyoming Circuit Court Judge Wendy Bartlett found as much, after

an evidentiary hearing, and dismissed all charges against Ms. Glustrom and Mr. Asprey.

### Legal Standard

Defendant's Motion to Dismiss asserts, pursuant to Federal Rule of Civil Procedure

12(b)(6), that Plaintiffs have failed to state a claim for which relief can be granted.  At this stage

of the litigation, a court's "'function on a Rule 12(b)(6) motion is not to weigh potential evidence

that the parties might present at trial, but to assess whether the plaintiff's complaint alone is

legally sufficient to state a claim for which relief may be granted.'" *Lesoon v. United States*,

1997 U.S. Dist. LEXIS 15670, 2 (D. Wyo. 1997) (quoting *Miller v. Glanz,* 948 F.2d 1562, 1565

(10th Cir. 1991)).  When assessing a motion to dismiss under Rule 12(b)(6) it is important to

take into account that "the Federal Rules of Civil Procedure erect a powerful presumption against

rejecting pleadings for failure to state a claim."  *Maez v. Mountain States Tel. & Tel.*, 54 F.3d

1488, 1496 (10th Cir. 2005); *see also In re Natural Gas Royalties Qui Tam Litig.*, 2001 U.S.

Dist. LEXIS 27006, 22 (D. Wyo. 2001).

In order to "survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  In order to establish that a claim is facially plausible, a plaintiff

must plead "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

contain detailed factual allegations," it "requires more than labels and conclusions" or the

"formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007).  That is, a plaintiff's complaint must contain enough factual allegations to raise

their "right to relief above the speculative level." *Id.* (explaining that the plausibility requirement merely calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the alleged illegal conduct); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (asserting that "plausible" does not mean "likely to be true," but is, instead, a nudge just beyond "conceivable").

"Determining whether a complaint states a plausible claim for relief is a context-specific task," *Iqbal*, 556 U.S. at 679, and therefore, in order to assess the sufficiency of a complaint under Rule 12(b)(6), a court must compare "the pleading with the elements of the cause(s) of action" underlying the plaintiff's complaint. *Burnett v. Mortgage Elec. Registration Sys.*, 706 F.3d 1231, 1236 (10th Cir. 2013). Although a plaintiff "'is not required to set forth a prima facie case for each element, [they] are required to set forth plausible claims' animating the elements of their cause of action." *Id.* (noting that pleadings that do not allow for at least a reasonable inference of the legally relevant facts are insufficient).

In order to state a claim for relief under § 1983, a plaintiff "must allege the violation of a right 'secured by the Constitution and laws' of the United States," and "must show that the alleged deprivation was committed by a person acting 'under color' of state law." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 946 (1982) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). In *Monell v. New York City Dept. of Social Servs.*, the United States Supreme Court held that municipalities are considered persons under § 1983 and therefore can be sued directly under the statute. *See* 436 U.S. 658, 690 (1978). While the Court's decision in *Monell* applied to municipal governments, it is now well established that Section 1983 applies to private defendants as well, including institutional defendants if they are acting under color of state law. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003). Because § 1983 liability only

attaches to conduct occurring "under color of law," a plaintiff asserting a claim against a private entity under § 1983 must establish that the illegal conduct at issue is "fairly attributable to the state." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995); *see also See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982) (noting that a plaintiff must demonstrate that conduct by an otherwise private party constitutes "state action").

The Court in *Monell*, however, conditioned the ability to impose liability on a municipality under § 1983 on the requirement that the plaintiff identifies a municipal "policy" or "custom" that caused his or her injury.[2] *Monell*, 436 U.S. at 694. This requirement was established in order to further the Court's second holding, which established that municipalities sued under § 1983 cannot be held vicariously liable under the theory of *respondeat superior*. *Id.* at 691. By requiring the plaintiff to identify a municipal policy or custom, the Court sought to ensure that the acts of a municipality were distinguished from the acts of the employees of such municipality, thereby making it "clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

Thus, in order to establish institutional l liability under § 1983—including liability for private entities acting under the color of state law—a plaintiff must allege that (1) his or her rights under federal law or the United State Constitution were violated (2) by the municipality or private entity at issue (3) acting under color of state law (4) pursuant to a policy or custom of such municipality or private entity and (5) which caused the alleged injury.

---

[2] While the Court in *Monell* solely addressed this requirement in the context of suing a municipality, it is now equally applicable to private entities acting under the color of state law.

## <u>ANALYSIS</u>

I. **Plaintiffs' Complaint Sufficiently Pleads that an Unconstitutional Policy or Custom of Defendant Created Their Injuries.**

Peabody claims that Plaintiffs'§ 1983 claims fail "because [Plaintiffs] did not sufficiently plead that an unconstitutional policy or custom of [the Defendant] caused their alleged injuries." Def.'s Mot. Dismiss 8. According to the Defendant:

> Plaintiffs do not allege that their purported injuries arose out of an unconstitutional custom or policy maintained by [the Defendant] because (1) [Plaintiffs'] conclusory allegations fail to plead the requirements of *Monell* with requisite particularity (2) Lt. Trebby's isolated arrest of Plaintiffs is a single event that fails to amount to a policy or custom (3) even if Plaintiffs properly pled a policy or custom, they have not identified one that offends the constitution and (4) Plaintiffs cannot use the doctrine of *respondeat superior* to avoid *Monell*.

*Id.* at 9. However, any reasonable reading of Plaintiffs' Complaint undoubtedly demonstrates it contains sufficient factual content for this Court to draw the inference that the Peabody is responsible for the alleged misconduct under § 1983. Plaintiffs' Complaint is replete with robust and extremely specific factual allegations, easily satisfying the basic requirements imposed by Fed.R.Civ.P. 12(b)(6) and Rule 8(b).

### A. Conduct by Private Corporations Acting Under Color of State Law Is Actionable Under Section 1983

Peabody argues that the Complaint does not adequately plead the requisites of *Monell* in order to state a claim against it. The adequacy (indeed, abundance) of allegations establishing that the Peabody Corporate Security Program constituted a "policy" sufficient to trigger *Monell* liability is set forth in the sections below. At the threshold, however, it is far from clear that Peabody is entitled to rely on the limits to liability that the Supreme Court provided to governmental entities under § 1983 in the *Monell* case. *See* Complaint, fn. 5 ("Plaintiffs recognize that under typical circumstances in the context of an indisputably public actor the law does not recognize *respondeat superior* liability for constitutional violations of supervisory

6

actors.  In the context of a private corporation that is acting under color of state law, however,

respondeat superior liability is available and appropriate.  *See generally Shields v. Ill. Dep't of*

*Corrections*, 746 F.3d 782, 786 (7th Cir. 2014) *cert. denied* 2015 U.S. LEXIS 442 (U.S. Jan. 12,

2015).").  Indeed, Judge Brimmer of this Court held that the underlying policy reasons

supporting Monell have no application to private defendants, such as Peabody, acting under

color of state law, and therefore the more restrictive liability rules do not apply in that context.

Judge Brimmer held as follows:  "This Court holds that *Monell*-type immunity should not extend

to private hospitals that act under color of state law to detain potentially dangerous mentally ill

individuals. The policy argument that "the possibility of liability will unduly inhibit the vigorous

exercise of official authority" does not apply to a private hospital such as Wyoming Medical

Center because it simply does not vigorously exercise official authority on behalf of the public

good."  *Moore v. Wyoming Medical Center*, 825 F.Supp.1531, 1548 (D.Wyo. 1993).

 *Monell* was decided in the context of determining whether a governmental institution

ought to be held liable for the unconstitutional conduct of a governmental employee.  Based

largely on policy considerations, the Court held that a plaintiff must demonstrate that the conduct

at issue was "fairly attributable" to the government agency itself, rather than an isolated,

individual action that was not foreseeable given the way the government agency trains and

supervises its employees.  *Monell v. Department of Soc. Svcs*., 436 U.S. 658 (1978).  Though

*Monell* is highly misunderstood by litigants and many courts, its holding is perfectly consistent

with Plaintiffs' Complaint as pled:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the
> conclusion that Congress did intend municipalities and other local government units to be
> included among those persons to whom § 1983 applies.  Local governing bodies,
> therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief
> where, as here, the action that is alleged to be unconstitutional implements or executes a
> policy statement, ordinance, regulation, or decision officially adopted and promulgated

by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell*, 436 U.S. at 690-91 (footnotes omitted).  The point is that there is not automatic liability based on the acts of an agent of a governmental entity (respondeat superior); there is only liability when the conduct at issue can be fairly said to be conduct of the organization itself.  This can be shown through any number of ways and methods of proof, so long as the conduct is shown to be municipal (or, in this case, corporate) conduct.

### B.  Plaintiffs Have Pled a Policy or Custom with the Requisite Particularity

Peabody contends that Plaintiffs' Complaint fails to plead "facts establishing that the Defendant maintained an unconstitutional custom or policy." *Id.* at 10.  According to the Defendant, any statements in the Complaint to this effect are merely "conclusory" and fail to "identify which specific policies or customs may have motived [Defendants'] actions."  *Id.* Plaintiffs' Complaint, however, clearly identifies, in great detail, the specific actions that form the legal basis for imposing § 1983 liability on the Defendant.

The ultimate question for purposes of determining whether it is appropriate to hold Peabody responsible under Section 1983 for the events at the shareholders' meeting is whether the results complained of -- the wrongful arrests of Plaintiffs -- were a fairly foreseeable consequence of a Peabody-authorized and sponsored program.[3]  The answer is obviously yes.

---

[3] The standard was best put by the Supreme Court in *Monell*, supra at 694: "We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or **by those whose edicts or acts may fairly be said to represent official policy**, inflicts the injury that the government, as an entity, is responsible

First, Plaintiffs' Complaint outlines how Peabody's security team conceived of the security plan and coordinated with the NWCCD Police Department to establish regulations and responses to any First Amendment protected activity that might occur at the meeting.  Compl. ¶ 18-26, 28, 31 (describing Peabody executive security team devising restrictions on speech), 32 (including official report of Lt. Trebby, detailing, *inter alia*, that "As a law enforcement officer for the NWCCD, I had been working with the executive security team from Peabody Energy for a few months leading up to this event.")  For further example, Plaintiffs' Complaint explains that "as soon as the meeting was announced, the Peabody executive security team contacted NWCCD PD via email to discuss its concerns regarding anticipated First-Amendment activity and to instruct the NWCCD PD as to how law enforcement should and would handle any 'incidents' that may occur." *Id.* at ¶ 22.  Although the particular name of the Peabody individual has not yet been discovered[4] (this is not surprising, since no discovery has yet taken place), the allegation that the "Peabody executive security team" devised, communicated, and managed the program is plenty sufficient at this stage to infer that it was an authorized program of the corporation, rather than a random, non-authorized series of events for which corporate responsibility would be unforeseeable or unfair.

Second, Plaintiffs' Complaint describes the specific content of this policy and program. For example, Plaintiffs' Complaint alleges that Peabody "instructed and directed the NWCCD PD on how to carry out Peabody's plan to create so-called 'free speech zone' that would regulate expressive activities at the meetings" and that Defendant and NWCCD "reached an agreement

under § 1983." (emphasis added).  The Complaint alleges throughout that high-level Peabody executives devised, implemented and supervised the Corporate Security Program.

[4] This official was likely Vic Svec, who is identified (and pictured) in the Complaint as supervising and participating in the arrests of Plaintiffs.  Mr. Svec is a high-level Vice President of Peabody.

that these so-called 'free-speech zones' would carry with them the force of law, and would be enforced under color of state law." *Id.* at ¶ 25. Plaintiffs' Complaint goes on to discuss in even greater detail how the free speech zones would operate, even providing a map of how these zones would be applied to the NWCCD campus. *Id.* at ¶ 31-33.[5]

Third, the Complaint discusses, at great length, how this policy was implemented on the day of the shareholder meeting. For example, Plaintiffs' Complaint alleges that "Peabody's senior leadership and executive security team was conspicuously and visibly present on the day of the meeting, and working closely with directing the NWCCD law enforcement officers on issues of security." *Id* at ¶ 34. In furtherance of this allegation, Plaintiffs' Complaint **provides an actual photograph of Defendant's Senior Vice President of Global Investor and Corporate Relations, Vic Svec, "in close proximity to and working shoulder-to-shoulder, jointly and in cooperation with, an NWCCD law enforcement officer on the day of the meeting.**" *Id.* at ¶ 35. Such compelling evidence demonstrating corporate approval, ratification and sponsorship of a joint operation of law enforcement involving a private party does not come along very often, particularly at the pleading stage. The rank of the corporate officers, and their conspicuous participation in the implementation of the security program (including the

---

[5] Although it should not be necessary given the specificity of the Complaint and the natural inferences drawn from the detailed allegations, if necessary Plaintiffs could amend their complaint to allege that Peabody authorized, adopted and ratified the provisions and terms of the security plan to make clear that this program constituted a "policy" warranting institutional liability under prevailing law. Allowing amendment of pleadings to cure any deficiencies in the pleadings is preferable than dismissal of the Complaint. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duncan v. Mngr., Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005). "Normally, the court affords a plaintiff an opportunity to amend the complaint to cure any pleading deficiencies." *Shell v. Am. Family Rights Ass'n*, No. 09-cv-0309-MSK-KMT, 2010 U.S. Dist. LEXIS 32140, at *46, n.19 (D. Colo. March 31, 2010). "The underlying purpose of Fed. R. Civ. P. 15(a) is, of course, to facilitate a decision on the merits." *Polhemus v. Great-West Life & Annuity Ins. Co.*, No. 09-cv-00093-MSK-KMT, 2009 U.S. Dist. LEXIS 102714, at *12 (D. Colo. Oct. 16, 2009).

enforcement of the security rules -- arrests of people deemed in violation of the security rules) speaks volumes about the inextricable linkage between Peabody and the police in this event.

Moreover, the Complaint recounts precisely how Plaintiffs' were unconstitutionally arrested pursuant to this policy:

> 37.    After the meeting, Defendant Officer Trebby, acting jointly with Peabody security officials, saw [Plaintiffs] near the exit of the Presentation Hall where the meeting had been held.  [Plaintiffs] were calmly and peacefully carrying a rolled-up banner that, when unfurled, read "Peabody Abandons Miners."

> 38.    Pursuant to the instructions and orders of the Peabody security team, Defendant Trebby demanded that [Plaintiffs] move to the designated "free speech zone" to express any anti-Peabody activities.

> 41.    Prior to reaching their car, [Plaintiffs] saw three miners wearing t-shirts stating "Peabody promised." [Plaintiffs] asked the miners if they would like to have their photograph taken with the "Peabody Abandons Miners" banner.  The miners said yes, so [Plaintiffs] paused for just a moment to unfurl the banner and stand with the miners while the photograph below was taken.

> 42.    Almost immediately after the photograph was taken, Officer Trebby determined that [Plaintiffs] would be arrested pursuant to the security and law enforcement plan and policy previously designated to regulate "activist" activities attendant with the shareholders meeting.

It is indisputable that this detailed and comprehensive description of (1) how the policy was formed (2) the content of the policy, and (3) how the policy was applied to Plaintiffs, sufficiently identifies which specific policies or customs may have motivated all Defendants' actions.  Peabody's categorization of Plaintiffs' Complaint as merely consisting of "conclusory statements" and "general allegations" is irreconcilable with the content of the Complaint, which goes above and beyond that which is required by Fed.R.Civ.P. 12(b)(6) and 8(b).

### C.  The So-Called "Single Event" Doctrine Does Not Bar Relief

Defendant claims that Plaintiffs' allegations are insufficient to impose liability against them under *Monell* because their Complaint only identifies one purportedly unconstitutional

event: Lt. Trebby's arrest of Plaintiffs. According to Peabody's Motion to Dismiss, this "single event" does not expose them to liability under *Monell* because "Plaintiffs have not pled that Lt. Trebby's actions were 'taken pursuant to a decision made by a person with the authority to make policy decisions."[6] Defendant's erroneous assertion is based on a misunderstanding of the governing law and its underlying principles.

As described in some detail above, in *Monell* the Court held that in order to impose municipal liability under § 1983, the unlawful conduct at issue must be made pursuant to a municipality's "official policy." *See Monell*, 436 U.S. at 694. The Court has since extended the reach of *Monell* by holding that "actions taken by a municipality's final policymaker also represents acts of 'official policy' giving rise to municipal liability." *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) (citing *Pembaur*, 475 U.S. at 481). As a result, a municipality is now "responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." *Id.* (emphasis added). The key inquiry in determining whether an organization is liable, not just an individual who engages in wrongdoing, is whether the conduct can be described as the official conduct of the organization itself. Sometimes that is proved by showing evidence of customary conduct. In some instances, like this one, the "official conduct of the corporation" can be shown by evidence of corporate approval, ratification, implementation and the like. The method of showing corporate responsibility is less important than a showing that the conduct alleged to be unconstitutional is fairly attributable to the corporation itself.

---

[6] Peabody is wrong in any event - Plaintiffs have adequately alleged that Lt. Trebby's arrest of Plaintiffs was a result of the Peabody-devised and jointly-implemented security program. To the extent more specific pleading on that point is required, Plaintiffs should be given an opportunity to cure any pleading defect through an amended complaint, which the law prefers over the more drastic action of dismissal.

While it is true that Plaintiffs *may* establish municipal liability on the basis that the unlawful conduct was taken pursuant to a decision made by a person with the authority to make policy decisions, *i.e.,* final policy makers, they are not *required* to as Defendant's motion suggests. Rather, Plaintiffs are also permitted to plead facts indicating that the unlawful actions alleged in their Complaint were taken by a subordinate employee pursuant to a corporation's pre-existing official policy, such as the well-thought-out and carefully devised and stringently enforced corporate security program applicable to the 2013 shareholders' meeting in Gillette.

Because Plaintiffs' Complaint sufficiently alleges that Lt. Trebby's unlawful actions were taken pursuant to Peabody's pre-existing official policy, it is of no consequence that the Complaint does not include allegations that Lt. Trebby's actions were taken pursuant to a decision made by a final policy maker. As demonstrated by the excerpts provided below, Plaintiffs' Complaint contains numerous factual allegations, which are each independently sufficient to satisfy Plaintiffs' obligation under Rule 12(b)(6):

> 43.     Almost immediately after the photograph was taken, Officer Trebby determined that [Plaintiffs] would be arrested pursuant to the security and law enforcement plan and policy previously designed to regulate "activist" activities attendant with the shareholders meeting.
>
> 44.     [Plaintiffs] politely told Defendant Trebby that he was infringing on their First Amendment rights. Defendant Trebby ignored their objections and, still pursuant to and in agreement with the previous jointly-developed (with Peabody) law enforcement plan for protest activities associated with the shareholders meeting, proceeded with arresting [Plaintiffs], allegedly for trespassing.
>
> 72.     The acts and omissions of Defendant Trebby were engaged pursuant to the customs, policies, and practices of Defendants Peabody and/or NWCCD, which encourage, condone, tolerate, and ratify the restraint on speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant Peabody and/or exercising their rights of free speech and dissent.

It is clear from a reading of these allegations that Plaintiffs' sufficiently pled that Lt.

Trebby's unlawful actions were taken pursuant to Defendant's pre-existing official policy. This,

and this alone, is sufficient to withstand Defendants' Motion to Dismiss on these grounds.

## II.     The Complaint States a First Amendment Claim

Peabody argues that, for two reasons, Plaintiffs fail to state a claim under the First

Amendment: (1) they fail to allege that they were engaged in constitutionally protected conduct;

and (2) they have not plausibly pled that Peabody was substantially motivated by constitutionally

protected conduct. These contentions are wrong. Indeed, the rudiments of a First Amendment

claim are so extensively pled in the Complaint that one wonders whether Peabody even read it.

Both of these elements are more than included in at least the following portions of the

Complaint:

> 30.     So that they would be allowed to attend the meetings associated with the shareholders meeting, Mr. Asprey and Ms. Glustrom obtained shareholder proxies from those shareholders who could not attend. They traveled from Colorado to Gillette with the intention of legally attending the shareholder meeting and abiding by all legitimate rules, regulations and laws, and to express disagreement with certain company policies and practices in a peaceful and law-abiding way, as is protected and permitted by the United States and Wyoming Constitutions.

> 37.     After the meeting, Defendant Officer Trebby, acting jointly with Peabody security officials, saw Mr. Asprey and Ms. Glustrom near the exit of the Presentation Hall where the meeting had been held. Mr. Asprey and Ms. Glustrom were calmly and peacefully carrying a rolled-up banner that, when unfurled, read "Peabody Abandons Miners."

> 39.     According to Defendants, Mr. Asprey's and Ms. Glustrom's "Peabody Abandons Miners" banner constituted anti-Peabody activity, and such anti-Peabody expressive activities was limited to the designated far-removed "free-speech zone".

Indeed, under the approach of "a picture is worth a thousand words," Plaintiffs'

Complaint even included *photographs* of them engaging in what can only be described as

constitutionally protected activity of protest against Peabody.





44.     Mr. Asprey and Ms. Glustrom politely told Defendant Trebby that he was infringing on their First Amendment rights. Defendant Trebby ignored their objections and, still pursuant to and in agreement with the previous jointly-developed (with Peabody) law enforcement plan for protest activities associated with the shareholders meeting, proceeded with arresting Mr. Asprey and Ms. Glustrom, allegedly for trespassing. He claimed that Mr. Asprey and Ms. Glustrom were blocking traffic.

46.     Mr. Asprey and Ms. Glustrom were not blocking traffic, nor were they violating any legitimate law or regulation.  They were arrested because of their expressive activities on issues of public concern; namely for their displaying of the banner which read "Peabody Abandons Miners."

49.     Mr. Asprey and Ms. Glustrom had expressed ideas and words critical of Peabody – ideas and words Peabody had taken every effort in conjunction with NWCCD law enforcement to regulate, restrain and silence from the day that the company decided to hold its meeting in Gillette.

50.     Peabody was a willful, active participant in and cause of NWCCD's arrest of Mr. Asprey and Ms. Glustrom.

51.     The only authority that Peabody could not exercise on its own was the independent authority to arrest those expressing such dissenting ideas and words – that is, those exercising their First Amendment-protected activities. Thus, the company used the NWCCD Police Department as an extension of its own executive security team to arrest and detain Mr. Asprey and Ms. Glustrom.

52.     The nexus between Peabody and the governmental authority exercised in arresting Mr. Asprey and Ms. Glustrom is so close that Peabody's conduct may be fairly treated as that of the State itself.

53.     Further, Peabody so far insinuated itself into a position of interdependence with NWCCD that it must be recognized as a joint participant in the arrest of Mr. Asprey and Ms. Glustrom.

54.     NWCCD delegated to Peabody a function traditionally exclusively reserved to the State – that is, the power to impose time, place, and manner restrictions on speech and expressive activity at a public educational institution on public property.

66.     Plaintiffs engaged in protected activity under the First Amendment's rights to free speech and expression by carrying, unfurling, and displaying their banner reading "Peabody Abandons Miners."

67.     Plaintiffs' speech and expression were related to matters of public concern.

68.     Defendants jointly and on their own accord responded to Plaintiffs' First Amendment-protected activity with retaliation, including but not limited to causing the unlawful arrest of them with no probable cause for such arrest.

69.     Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights.

70.     By unlawfully arresting and causing the continued prosecution of Plaintiffs, Defendants sought to punish Plaintiffs for exercising their First Amendment rights and to silence their future speech and restrict their freedom of expression, and the future speech and expression of others. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment-protected activity.

Peabody spends considerable space making the curious argument that the "Complaint contains no allegations that Peabody took any action subsequent to Plaintiffs' allegedly protected speech." It is unclear how Peabody could make this conclusion. The Complaint extensively details Peabody's awareness of the expressive activity, and each of the steps taken (jointly with the NWCCD police) in response to such activity, including the arrest, in which Peabody jointly participated. Compl. ¶¶ 37, 49-54, 68-70 and pictures after ¶¶ 35 and 55 (depicting Peabody officials on the scene, observing events surrounding arrest). The Complaint is detailed and well-supported by documentary and photographic evidence, well-beyond a typical Complaint, and well above any "plausibility" standard.

## III.    The Complaint States a Fourth Amendment Violation

Peabody argues that the Complaint inadequately alleges a lack of probable cause for the arrest of Plaintiffs, and therefore no Fourth Amendment violation has been stated.[7] On the contrary, the Complaint extensively and in great detail alleges an illegal, unconstitutional arrest without probable cause, with Lt. Trebby and Peabody jointly participating and responsible, and Peabody's motion should be rejected. Compl. ¶¶ 45-54, 56-57, 60-62, 68, 70-71, 78-81, 84, 89, 91, 99-102.

Apparently recognizing that Circuit Court Judge Bartlett's ruling after an evidentiary hearing that there was no probable cause to arrest Plaintiffs for the crime of trespass foreclosed further challenge on that issue, Peabody pivots and supposes that there was probable cause to believe some other crime may have been committed when Plaintiffs unfurled their "Peabody Abandons Miners" banner. As support, Peabody asserts that there was "probable cause to

---

[7] Defendant Trebby filed a motion to dismiss making essentially the same argument. Plaintiffs' response brief to that motion details the adequacy of the Complaint in stating a Fourth Amendment violation, and the arguments set forth in that response are incorporated herein.

believe that Plaintiffs disrupted and obstructed the NWCCD parking lot."  Motion at 21.[8]

Although such a "Hail Mary" by Peabody might be debatable at some later stage of these

proceedings, such as trial, it is no basis to dismiss the Complaint for failure to state a claim.

There is no question that the Complaint fulsomely alleges that there was <u>no</u> probable cause, at

all, to believe that <u>any</u> crime had been committed.  *See* Compl., *supra*, *passim*, esp. ¶¶ 79-80

(plaintiffs were arrested "without <u>any</u> reasonable justification or probable cause" "to believe

plaintiffs had committed <u>any</u> offense.")(emphasis added).  And, Judge Bartlett's findings failed

to allow any such "saving" analysis, finding instead that the arrest simply violated the Fourth

Amendment ([T]he arrests in the present case violated the Defendants' Fourth Amendment

rights…").  Such a finding surely makes the identical claim made in the current civil complaint –

a Fourth Amendment violation – at least plausible.

### IV.    Plaintiffs' Complaint States a Claim for Deprivation of Liberty Without Due Process

Peabody next asserts that Plaintiffs fail to state a claim under the Due Process Clause of

the 14th Amendment.  Peabody's argument misapprehends the Due Process claim, and should be

rejected.  Peabody assumes that the Third Claim for Relief is identical to the Second Claim,

alleging a violation of the Fourth Amendment.  (Peabody describes this as a "duplicative claim."

Motion at 27).  The Third Claim, however, is not as limited as the Second Claim, and Plaintiffs

intend it to capture a broader array of facts than only the illegal arrest.  "Protected liberty

interests may arise from two sources — the Due Process clause itself and the laws of the states."

*Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). Liberty under

the Due Process clause is broader than "freedom from bodily restraint." *Meyer v. Nebraska,* 262

---

[8] Peabody's suggestion that someone might be legitimately arrested for "disrupting a parking lot" by taking a picture of a banner unfurled for several seconds or so is dubious, at best.

U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Moore v. Wyoming Medical Center*, 825 F.Supp.1531 (D.Wyo. 1993)(Brimmer, J.)[9]   The Complaint goes into considerable detail outlining the premeditated planning and execution of a coordinated program designed to squelch free speech rights, or to punish people for engaging in free speech if the restrictions and deterrence fail.  The Complaint alleges (and plainly raises compelling inferences) a conspiracy to deprive legitimate protesters of their fundamental constitutional rights.  Such conduct aimed at suppressing or punishing the exercise of constitutional rights implicates much more than an "unreasonable seizure" under the Fourth Amendment.  There is no question that the Complaint "states a claim" in this regard, and Plaintiffs are entitled to discovery, to fully flesh out the details of each party's respective role and responsibility for the constitutional violations inflicted upon Plaintiffs.

**V.    The Complaint States a Claim For Conspiracy to Interfere with Civil Rights Under 42 U.S.C. § 1985, but Plaintiffs are Choosing to Voluntarily Dismiss Such Claim**

Although Plaintiffs contend that they have more than adequately pled their claim for violation of 42 U.S.C. § 1985,[10] they have decided to voluntarily dismiss the claim in favor of the continued prosecution of his remaining claims.

---

[9]  If an amendment of the Complaint is necessary to correct any pleading deficiencies, Plaintiff would request the opportunity to amend as an alternative to dismissal of any claims.  *See* footnote 3, *supra*.  Nevertheless, as exhaustively alleged in the Complaint, Plaintiffs' due process rights were plainly violated.  As Judge Brimmer observed in *Moore v. Wyoming Medical Center,* 825 F.Supp. 1531, 1537 (D.Wyo. 1993), "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Bee v. Greaves,* 744 F.2d 1387, 1393 (10th Cir.1984) (citing *Youngberg v. Romero,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982)).

[10] Plaintiffs will file such a Motion prior to the hearing on these matters.  To prove a violation of section 1985(3), a plaintiff must show: "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).  The plaintiff must also show the conspirators

## VI.    Plaintiffs' Complaint State a Claim of Civil Conspiracy

Almost in passing, Peabody contends that the Complaint fails to state a claim of civil conspiracy under Wyoming law.  No authority is cited, and the only argument forwarded is that since the Complaint fails to allege any underlying substantive violations, the conspiracy claim must fail.  As detailed exhaustively above, the Complaint sets forth solid claims of constitutional violations, which are an adequate predicate for a claim of civil conspiracy under Wyoming law. The Complaint, the allegations of which must be taken as true, would certainly state a claim of civil conspiracy under Wyoming law.  *White v. Shane Edeburn Constr., LLC*, 2012 WY 118, P29-P30 (Wyo. 2012)("As we have previously noted, a plaintiff cannot claim civil conspiracy or punitive damages without an underlying cause of action in tort. *Cent. Wyoming Med. Lab., LLC v. Med. Testing Lab, Inc.*, 2002 WY 47, 13, 43 P.3d 121, 126 (Wyo. 2002). In this instance, Ms. White's conspiracy claim fails for the same reasons that are fatal to her claim of fraud. Fundamentally, in order to show that she was entitled to relief, Ms. White was obliged to allege that she suffered damages resulting from Appellees' conduct.").  Plaintiffs extensively allege damages.

WHEREFORE, Defendant Peabody's Motion to Dismiss for failure to state a claim should be DENIED.

---

targeted him "because of" his membership in some class, and "the criteria defining the class were invidious." *Lessman v. McCormick*, 591 F.2d 605, 608 (10th Cir. 1979).

Plaintiffs' Complaint alleges a concerted action among the Defendants to deprive them of their rights to equal protection under the law and equal privileges and immunities under the law, including their rights to be free from unreasonable searches and seizures pursuant to the Fourth Amendment, and that the invidious discrimination against them was based upon their decisions to engage in constitutionally-protected expressive activities. *See* Complaint, *passim.*  At this stage in the litigation, when all allegations much be viewed in the light most favorable to Plaintiffs, it is certainly plausible (indeed, likely) that such a conspiracy existed.  It has become apparent to counsel for Plaintiffs, however, that dismissal of this claim will streamline the litigation without any reduction in available remedy or reduction in scope of discovery.

DATED this 4th day of August 2015.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____
Darold W. Killmer
Julian G.G. Wolfson
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
dkillmer@kln-law.com
jwolfson@kln-law.com

Ian Sandefer
Donald Fuller
FULLER, SANDEFER & ASSOCIATES
242 South Grant
Casper, Wyoming 82601
Phone: (307) 265-3455
sandefer@fullersandeferlaw.com
fuller@fullersandeferlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT PEABODY'S MOTION TO DISMISS** was served on August 4, 2015 via CM/ECF to the following:

John R. Haug
David M. Fedder
Rachel Milazzo
DENTONS US LLP
One Metropolitan Square
211 N. Broadway, Suite 3000
St. Louis, MO 63102-2741
(314) 241-1800
(314) 259-5959 (fax)
john.haug@dentons.com
david.fedder@dentons.com
rachel.milazzo@dentons.com

Kym Davis Rogers
DENTONS US LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201
(214) 259-0900
(214) 259-0910 (fax)
kym.rogers@dentons.com

Bruce A. Salzburg
CROWELL & MORING, LLP
1604 Pioneer Avenue
Cheyenne, WY 82001
(307) 996-1400
(307) 996-1419 (fax)
bsalzburg@crowell.com

*Attorneys for Peabody Energy*

Chris Voigt
CROWLEY FLECK PLLP
490 N. 31st Street, Suite 500
Billings, MT 59101
(406) 255-7239
(406) 259-4159 fax
cvoigt@crowleyfleck.com

*Attorney for Northern Wyoming Community College District*

Theodore R. "Torey" Racines
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, WY 82002
(307) 777-7862
(307) 777-8920 fax
torey.racines@wyo.gov

*Attorney for Deputy Chad Trebby*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

_____

Jesse Askeland